
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 23, 2017

## MARY L. VAUGHN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hawkins County**
**No. 15CR0223      John F. Dugger, Jr., Judge**

---

## No. E2016-01309-CCA-R3-PC

---

The petitioner, Mary L. Vaughn, appeals the denial of her petition for post-conviction relief, which petition challenged her 2014 Hawkins County Criminal Court guilty-pleaded convictions of second degree murder and aggravated child abuse, arguing that she was denied the effective assistance of counsel and that her guilty pleas were not knowingly or voluntarily entered. Discerning no error, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Nicholas Spring Davenport, V, Morristown, Tennessee, for the appellant, Mary L. Vaughn.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; James O. Phillips, District Attorney General; and M. Ryan Blackwell and Cecil C. Mills, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Hawkins County Grand Jury charged the petitioner with two counts of first degree felony murder, one count of aggravated child abuse, and one count of aggravated child neglect for her role in the death of the victim, Alexa Rae Linboom. Pursuant to a plea agreement with the State, the petitioner entered a "best interests" guilty plea[1] to aggravated child neglect and a reduced charge of second degree murder. The

---

[1] In *North Carolina v. Alford*, 400 U.S. 25, 37 (1970), the United States Supreme Court held that

agreement provided for consecutive sentences of 20 years with a 100 percent release eligibility percentage for the petitioner's conviction of second degree murder and 15 years with a 60 percent release eligibility percentage for the petitioner's conviction of aggravated child neglect. In exchange for the petitioner's plea, the State agreed to dismiss those counts of the indictment charging the petitioner with aggravated child abuse and felony murder in the perpetration of aggravated child abuse.

The State offered the following detailed recitation of facts at the guilty plea submission hearing:

> These cases concern the death of Alexa Rae Linboom, a five-year-old child at the time of her death. Alexa was the daughter of Randall Vaughn and the step-daughter of [the petitioner]. On December 31, 2011, [the petitioner] and Randall Vaughn were having a New Years Eve get-together at the residence of 319 Ridge Haven Drive in Surgoinsville, Tennessee. Present at the house that evening were [the petitioner], Randall Vaughn[,] and several family members including Alexa.
>
> The following morning, January 1st, 2012, [the petitioner] and Randall Vaughn discovered two empty grape soda cans at their home. [The petitioner] asked Alexa if she had dr[u]nk the sodas without permission and that she was prohibited from doing [so]. Alexa responded affirmatively that she had in fact dr[u]nk the grape sodas. Randall Vaughn and [the petitioner] then decided to attempt to break Alexa of this behavior. [The petitioner] and Randall proceeded to take Alexa into the bathroom of their home. There, as punishment for sneaking the grape sodas, Alexa was required to drink numerous additional grape sodas. During this punishment Alexa consumed an undetermined amount of grape soda and also ingested a substantial amount of water. The total amount of fluid ingested by Alexa as part of this disciplinary act was estimated to be approximately 2.4 liters. As a result of the extreme volume of liquid consumed Alexa began vomiting and having diarrhea. She also began clenching and posturing in a decorticate manner, which can be signs of loss of brain activity. Alexa was taken to the Hawkins County Emergency

a criminal defendant may enter a guilty plea without admitting guilt if the defendant intelligently concludes that his best interests would be served by a plea of guilty.

room by [the petitioner] and Randall Vaughn hours after the punishment began.

Alexa presented unresponsive at the Hawkins County Emergency Room. Alexa was then air-lifted to the Johnson City Medical Center where she was admitted to the Niswonger Children's Hospital. Emergency medical intervention was initiated, however, unfortunately, their efforts proved unsuccessful. Alexa Linboom was pronounced dead on January 3rd, 2012. An autopsy examination was conducted on January 5th, 2012, at the East Tennessee State University Department of Forensic Pathology. The final autopsy revealed that the extreme volume of liquid which Alexa consumed caused the sodium level in her blood to drop and resulted in her brain swelling. Alexa's brain proceeded to herniate through her skull[,] and she eventually died. In the autopsy report, Dr. Karen Cline-Parhamovich concluded the cause of death to be acute fluid water intoxication causing hyponatremic encephalopathy. The manner of death was concluded to be a homicide.

The petitioner filed a timely petition for post-conviction relief, alleging, among other things, that she had been deprived of the effective assistance of counsel and that, as a result of counsel's deficient performance, her guilty pleas were not knowingly and voluntarily entered. She claimed that counsel performed deficiently by failing to fully explain the ramifications of her plea agreement, failing to seek a mental evaluation of the petitioner, and failing to "zealously defend the [p]etitioner to protect her rights."

At the September 26, 2016 evidentiary hearing, the petitioner testified that she met with trial counsel "[a] little over 12 times" prior to the guilty plea hearing and that she also met with other members of trial counsel's staff to discuss the case. She said that counsel discussed the witness statements and medical records with her but that she did not "remember a lot of the things." She acknowledged that trial counsel discussed with her the evidence against her, the elements of the offenses, and the State's burden of proof. She expressed that she remained dissatisfied with trial counsel's work, explaining, "I think he should have done more on the outside to come and report to me that he was trying to find a way out of this for me."

The petitioner testified that she wanted to go to trial but that trial counsel discouraged her from going to trial by telling her that they were likely to lose. She said that she agreed to plead guilty after counsel told her that her "husband was going to sign"

-3-

the plea agreement and that "if we went to trial that it would be a he said/she said thing." She claimed that she signed the plea documents because she believed "in [her] way of thinking" that "if [her] husband took the plea" that she "had to take the plea." She claimed that counsel told her, "Your husband took it, you might as well take it." She added that her husband, who "was in the next thing over there," told her, "Just sign it, baby, sign it for the girls." The petitioner explained that her husband did not want his other daughters to testify. She clarified that counsel did not tell her that she had to take it but that she "might as well take this plea." The petitioner acknowledged that trial counsel told her that the State had made other offers but that the one she accepted "was the best." She insisted that trial counsel and her husband worked together to convince her to accept the plea offer. The petitioner also said that she pleaded guilty because she "just wanted it done and over" and because she "was tired of everything."

The petitioner testified that during the plea colloquy, trial counsel "had a piece of paper and when Randy Collier read out the thing, he pointed to the question and then [she would] say yes." She explained, "Before we came that morning [counsel] told me that I was going to answer yes every time they asked a question." Upon questioning by the post-conviction court, the petitioner acknowledged that it was, in fact, the trial judge who asked the questions during the plea colloquy and that she did not actually answer yes to every question that was asked.

The petitioner admitted that she told the trial court during the colloquy that she was satisfied with counsel's representation but claimed that she did not know why she had said that, saying, "I'm scared now. I just want to go home." She said that when she told the court that she was satisfied with counsel's representation and that she believed the plea agreement to be in her best interest, she was not telling the truth "in [her] heart." She added, "I lied because I just wanted it over."

During cross-examination, the petitioner admitted that trial counsel met with her on a regular basis, visiting her some 30 times during the 10 months that she was incarcerated prior to pleading guilty. In addition to trial counsel, another attorney in his office and an investigator met with the petitioner at the jail. The petitioner acknowledged that trial counsel explained the charges "[a] couple of times," that he reviewed the State's evidence with her, that he reviewed the victim's medical records with her, and that he provided her with a copy of the records from the juvenile court proceedings relative to the victim's death. The petitioner agreed that trial counsel explained the elements of the offenses charged in the presentment, the State's burden of proof, and the potential range of punishment. She recalled that trial counsel told her that the State could seek the death penalty for the first degree murder charges. She agreed that the plea agreement provided her with a much more favorable, albeit lengthy, sentence.

The petitioner identified her signature on the plea documents and admitted that trial counsel explained the plea agreement to her in detail. She said that she understood the terms of the plea agreement and those rights she was waiving by pleading guilty.

Trial counsel testified that he was appointed to represent the petitioner following the return of the presentment. Counsel said that either he or a member of his staff went through the discovery materials, which were voluminous, with the petitioner "page by page, word for word" in a series of meetings that lasted from an hour to an hour and a half. Counsel stated that he endeavored to "meet with her or have someone meet with her about every week" because he was concerned about the petitioner's "relationship with her husband," "worried that she would talk," and "did not want her to feel abandoned." He said that the petitioner "certainly wasn't happy that [he] wasn't coming back saying that the case was going away." Counsel testified that he thoroughly explained the elements of each of the charged offenses and the potential punishments to the petitioner. Counsel recalled that a new district attorney general had just been elected and that "there had been some discussion thrown our way" that the new district attorney general might seek the death penalty. For that reason, he discussed the aggravating circumstances with the petitioner.

Counsel testified that he began plea negotiations "earlier on" and that the initial "offers ranged from outrageous things to life." Counsel candidly acknowledged that he did not share every offer with the petitioner, explaining, "I'm not going to go to a client and tell them that someone offered them two life sentences and such, there's no point to that in a case like this." He said that the first offer he communicated to the petitioner provided for a 35-year sentence to be served at 100 percent. He recalled that "she was actually accepting of that." Counsel stated that he did not communicate the petitioner's acceptance at that point "because her husband was negotiating in e[a]rnest, too, and there's something embarrassing about accepting something worse than a co-defendant gets." He said that he communicated the offer that the petitioner eventually accepted "[i]mmediately" because he was aware that if the petitioner did not accept it, the case was "going to be enhanced." He also communicated to the petitioner that if the State filed notice seeking the death penalty, the State would not likely offer anything less than a life sentence. Counsel adamantly denied threatening the petitioner to force her to accept the offer.

Counsel testified that he was prepared to go to trial. During his preparation, he "looked at causation of death as seriously as [he] knew how." He said that he spoke with consultants and other lawyers to see if he could "find another cause of death." When that line of investigation proved unproductive, he changed his focus to whether he "could convince a jury that [the petitioner] . . . did not intend for the child to

-5-

die and this could not even be interpreted as neglect." He said that the petitioner "was not a primary mover in what happened to this child and that she behaved in a reasonable manner." He said that the petitioner's actions nevertheless "amounted to what he feared was neglect" and that he did not know whether such a defense could have worked.

Counsel stated that he talked to the petitioner about a psychological evaluation, as he does with clients "very often." As the case proceeded, however, the petitioner "seemed to understand what was going on and was asking good questions" that "indicated she was listening." He added that none of his staff who met with the petitioner expressed any concerns about her competence, and he saw none. As a result, he determined that an evaluation was unnecessary.

Counsel testified that he read "the plea sheet form" to the petitioner "word for word" before he added "in what the charge or the punishment is" and that he "explained it as we went through it, every section in some detail." He explained that he did it that way because he wanted his clients to understand "the sheet" rather than focus on the offense or punishment. He said that he then "handed [the sheet] to her and said take this back and read it and" told her "if you have any questions mark them and we'll go over it." Counsel said that he "also got a blank of [the] judge's checklist" so that he could help the petitioner understand "what it was like in court." He recalled that the petitioner "was nervous and wanted to know" "how the court is going to proceed," which, to him, "seemed like a reasonable thing." Only after going over this information did counsel fill out the plea forms and go through them with the petitioner. He said that she had "[a] couple of days" to go over the form that she took back with her to the jail. He stated that the petitioner did not have any questions and "said she understood" the plea agreement. Counsel said that he could not recall "anything really special" about the day the petitioner entered her pleas. He said the petitioner appeared to be physically and mentally well on that day.

During cross-examination, counsel said that he had no qualms about taking the case to trial and would have gone to trial had the petitioner indicated that she wanted to do so. He said that, with regard to a desire to go to trial, the petitioner "was all over." He recalled that she gave him authority to negotiate a plea agreement and eventually decided that "she wanted to plea." He acknowledged that she "probably" asked his opinion on whether she should accept the plea agreement, but he said that he does not "give that."

Counsel testified that he attempted to procure a medical expert but "was unsuccessful in finding any expert to help" the petitioner's case. He added that the petitioner's husband's attorney "was having the same sort of results" in trying to procure the services of an expert. He recalled that the petitioner "wanted [him] to get the

individuals who counseled her and her husband as to how to take care of children and get them pinned down on the fact that some forms of punishment they recommended . . . were all right by them." He said that he spoke with a few of those individuals "and they denied the extent to which [the petitioner] was saying they said that." He added that he "didn't spend a lot of time on that because it really . . . didn't mean too much in the case." He said that he felt uncomfortable with that line of investigation because "that defense really boils down to" a claim that the petitioner was "abusive because someone told us it was okay to be abusive." He tried to explain to the petitioner that such a defense "doesn't set too well just as it doesn't work to point out how perhaps a child really needed to be disciplined." He said that it was his experience that "[t]hose things don't work in this kind of case." He explained, "I felt it would be very hard to go to trial and attack a child who had died in this manner in any way, as it being justified or warranted." He said that the petitioner "always seemed to understand" that that could not be "the focus of the defense."

Counsel testified that the petitioner and her husband "had influence on each other" to plead guilty but that he "would hope that" the petitioner "would make a decision for herself" because "that's what [counsel] told her to do." He said that he spoke with the petitioner just before she entered the plea and that she did not waver in her choice to plead guilty. Counsel reiterated that he did not tell the petitioner to answer "yes" to every question during the plea colloquy.

In its written order denying post-conviction relief, the post-conviction court accredited trial counsel's testimony that "he explained the charges and potential punishments to" the petitioner; that she "understood everything including that the [S]tate could file an enhancement and give Notice of the Death Penalty"; and that counsel "did not pressure her to take the plea." The court also accredited counsel's testimony that the petitioner rejected two other plea offers and "wanted to know what her husband was going to do" before she accepted the State's ultimate offer. The court found, based upon the petitioner's testimony at the guilty plea submission hearing and trial counsel's testimony at the evidentiary hearing, that the petitioner "entered her best interest plea freely, knowingly[,] and voluntarily." The court found that trial counsel "investigated the case including trying to find an expert to rebut the [S]tate's medical proof. [Counsel] obtained the best plea agreement that he could get for" the petitioner.

In this appeal, the petitioner contends that the post-conviction court erred by denying relief, reiterating her claim that she was denied the effective assistance of counsel and that, as a result of counsel's ineffective assistance, her guilty pleas were not knowingly and voluntarily entered. The State asserts that the post-conviction court did not err.

-7-

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Apart from whether a guilty plea is the product of ineffective assistance of

-8-

counsel, it is invalid if otherwise made unknowingly or involuntarily. "Whether a plea was knowing and voluntary is an issue of constitutional dimension because '[t]he due process provision of the federal constitution requires that pleas of guilty be knowing and voluntary.'" *State v. Wilson*, 31 S.W.3d 189, 194 (Tenn. 2000) (quoting *Johnson v. State*, 834 S.W.2d 922, 923 (Tenn. 1992)). A plea "may not be the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats.'" *Wilson*, 31 S.W.3d at 195 (quoting *Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969)); *see also State v. Mellon*, 118 S.W.3d 340, 345 (Tenn. 2003) (citing *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993)).

A claim of ineffective assistance of counsel is a mixed question of law and fact. *Kendrick*, 454 S.W.3d at 457; *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Kendrick*, 454 S.W.3d at 457; *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the record fully supports the denial of relief in this case. Trial counsel's accredited testimony established that he performed a thorough investigation of the case and advised the petitioner of the nature of the charges, the potential punishments, and the consequences of pleading guilty. The petitioner candidly acknowledged that trial counsel had explained all the relevant information to her prior to her accepting the plea agreement. The record belies the petitioner's testimony that counsel pressured her into accepting the plea agreement and pleading guilty in this case. Instead, the record supports the post-conviction court's conclusion that the petitioner's guilty pleas were knowingly, intelligently, and voluntarily entered.

Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE